# UNITED STATES ET AL. v. DETROIT & CLEVELAND NAVIGATION CO. ET AL.

No. 22. Argued October 9, 10, 1945.—Decided November 5, 1945.

*Mr. Charles H. Weston,* with whom *Acting Solicitor General Judson, Assistant Attorney General Berge, Messrs. Walter J. Cummings, Jr., Daniel W. Knowlton* and *Daniel H. Kunkel* were on the brief, for the United States and the Interstate Commerce Commission; and *Mr. Sparkman D. Foster* for the T. J. McCarthy Steamship Co. et al., appellants.

*Messrs. S. S. Eisen* and *Ernest S. Ballard,* with whom *Messrs. James Turner, Willis C. Bullard, Isaac H. Mayer* and *Carl Meyer* were on the brief, for appellees.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The Interstate Commerce Commission pursuant to § 309 (c) of Part III of the Interstate Commerce Act (54 Stat. 941, 49 U. S. C. § 909 (c)) granted to T. J. McCarthy Steamship Co. and Automotive Trades Steamship Co. (whom we will call the applicants) a certificate of convenience and necessity to operate as common carriers in the transportation by water of motor vehicles from Detroit, Michigan to ports on Lake Erie and Lake

Superior.[1]  260 I. C. C. 175.  The appellees, who were protestants in the proceeding before the Commission and who are common carriers of motor vehicles by vessels on the Great Lakes, challenged that order before a district court of three judges.  That court set aside the Commission's order.  57 F. Supp. 81.  The case is here on appeal.[2]

World War II caused the cessation of the production of motor vehicles for civilian use.  Prior to that time appellees as common carriers had transported motor vehicles by vessels from Detroit to various ports on the Great Lakes.  The applicants owned three vessels equipped as automobile carriers.  These vessels were used extensively prior to the war in transporting automobiles from Detroit to Lake Erie ports.  They were for the most part under charter to one of the appellees from 1936 through 1941.  With the advent of the war the United States requisitioned many of the vessels of the appellees, using some of them for carrying bulk commodities on the Great Lakes and removing others to the salt water.  As a result, two of the appellees at the time of the hearing[3] in June, 1943, had no automobile carriers and were not operating; the third was operating nine vessels, of which five were owned by and operated for the United States.  In contrast, the applicants owned their three vessels free and clear of any incumbrance; and while those vessels had been converted for carrying bulk traffic, all of the equipment necessary for reconversion into automobile carriers had been preserved.  The Commission found that prior to the war there were insufficient facilities for the movement of automobiles on

---

[1] The companies are both controlled by T. J. McCarthy.  The certificate runs to T. J. McCarthy Steamship Co., for itself and as managing agent of Automotive Trades Steamship Co.

[2] Sec. 210 (28 U. S. C. § 47a) and § 238 of the Judicial Code as amended, 28 U. S. C. § 345.

[3] The Commission rendered its decision on March 7, 1944.

the Great Lakes during certain peak periods even with the carrying capacity of applicants' vessels included. There was testimony of automobile manufacturers and of motor common carriers that the carrying capacity of applicants' vessels would be needed when the manufacture of automobiles was resumed. The Commission found that prior to the war there was a definite need for the carrying capacity of applicants' vessels in this transportation and that there was a reasonable certainty that a like need for that capacity would arise when the production of automobiles for civilian use was resumed. It found that while the applicants could readily reconvert their vessels to handle automobile traffic, there was considerable uncertainty as to the length of time it would take the appellees to procure and place in operation the additional vessels which would be needed when production of automobiles for civilian use was resumed. It concluded that the public interest would be adversely affected if, after production was resumed, appellees were delayed in acquiring the additional facilities needed to meet the transportation demands. On that basis it held that the proposed service would be required by future public convenience and necessity.

The District Court held that the Commission's order could not be sustained in absence of evidence that applicants' vessels were the only vessels available to appellees to meet the prospective transportation demands beyond that furnished by their own vessels. It concluded that not only was there no finding that if applicants' vessels were not chartered there was no other carrying capacity which could have been acquired but that the record established the contrary.

The case, however, is not one where there is a service presently being rendered and a newcomer seeks entry into the field. Whether in that event the ruling of the District Court would be correct is a question we do not reach.

While the authority of appellees to serve as carriers has not been terminated, the service formerly rendered by them has been interrupted by the war. The applications concern a proposed additional service to be rendered in the future. Sec. 309 (c) authorizes the Commission to permit the proposed service to be rendered if it "is or will be required by the present or future public convenience and necessity." That entails a prophecy so far as future requirements are concerned. The Commission made that prophecy on the basis of (1) the earlier service which had been discontinued during the war, (2) the likely requirements for the future, and (3) the ability of the existing carriers to effect an expeditious resumption of service at the war's end. The ability of the applicants promptly to render the service at that time is adequately established. Whether the appellees could or would move with like dispatch is less certain. Many of the vessels which they previously owned had been taken by the United States. And the Commission had doubt as to whether they would or could obtain the necessary additional transportation facilities in time to meet the foreseeable future demands which would arise when automobile manufacture was resumed. We do not have here a case where there was a surplus of facilities in the prior service which the war interrupted. The Commission indeed found that the prior service had not been adequate, a finding which we think is supported by evidence. It took that fact into consideration in determining the margin of safety which the public interest required for the resumption of the interrupted service. We think the inadequacy of the prior service was relevant to that determination. It not only bore upon the future shipping needs which were likely but also underscored the danger of delays in resuming the service if the field were left exclusively to existing carriers.

If the Commission were required to deny these applications unless it found an actual inability on the part of

existing carriers to acquire the facilities necessary for future transportation needs, a limitation would be imposed on the power of the Commission which is not found in the Act. The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function the Commission has been entrusted with a wide range of discretionary authority. *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies. Its doubt that the public interest will be adequately served if resumption of service is left to existing carriers is entitled to the same respect as its expert judgment on other complicated transportation problems. See *Chesapeake & Ohio R. Co.* v. *United States,* 283 U. S. 35, 42; *Alton R. Co.* v. *United States,* 315 U. S. 15, 23. Forecasts as to the future are necessary to the decision. But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide. It went no further here.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.