COMMERCIAL TRANSPORT, INC.,
Plaintiff,

v.

UNITED STATES of America and The Interstate Commerce Commission, Defendants (Central Territory Railways et al., Intervening Defendants.)

Civ. A. No. 3974.

United States District Court
E. D. Illinois.

Jan. 23, 1959.

PLATT, Chief Judge.

Plaintiff, an Illinois Corporation, with its principal place of business in St. Clair County, Illinois, and in the Eastern District of Illinois, presents its complaint to set aside the report and orders of the Interstate Commerce Commission decided May 10, 1957 and October 3, 1957 denying an application for certificate of public convenience and necessity in Commercial Transport, Inc., Extension Illinois-Missouri, Docket No. M.C. 13–104654 (Sub. No. 106). Plaintiff presents its complaint to this court under section 205(g) of the Interstate Commerce Act, 49 U.S.C.A. § 305(g), and section 10 of the Administrative Act, 5 U.S.C.A. § 1009. The court has jurisdiction of the subject matter and the parties. Judicial Code and Judiciary, Title 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325.

Plaintiff filed an application on October 26, 1956 seeking a certificate of public convenience and necessity authorizing the operation in interstate commerce, as a common carrier by motor vehicle over irregular routes, of cement, in bulk, in hopper vehicles, between points in Missouri and Illinios. The application was assigned to and heard by a joint board on January 8, 1957. Five railroads who serve this territory and are intervening defendants in this suit, and the Lehigh Portland Cement Company appeared by petition in opposition to the application. The Alpha Portland Cement Company and the Missouri Portland Cement Company provided witnesses who testified against the application on behalf of the railroads. No motor carrier appeared.

On February 1, 1957, the joint board issued a report and an order recommending that applicant be granted authority to transport cement in bulk, in hopper vehicles, between points in Illinois and Missouri over irregular routes. On February 13, 1957 protestant cement company filed exceptions to this report and recommended order, and on March 4, 1957 intervening railroad defendants also filed their exceptions. On March 25, 1957 plaintiff filed a reply to those ex-

Mack Stephenson, Springfield, Ill., for plaintiff.

Victor R. Hansen, Asst. Atty. Gen., Arthur J. Cerra, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Amos M. Mathews, Chicago, Ill., Clifford M. Raemer, U. S. Atty., East St. Louis, Ill., for defendants.

Before FINNEGAN, Circuit Judge, PLATT, Chief Judge, and JUERGENS, District Judge.

ceptions. May 24, 1957 the report and order of division 1 of the Interstate Commerce Commission dated May 10, 1957 denied plaintiff's application, thereby rejecting the recommendation of the joint board. July 1, 1957 plaintiff filed a petition for reconsideration with the Commission, and the intervening defendants and the cement producer filed a timely reply. On October 3, 1957 the full Commission upheld the decision of division 1 denying plaintiff's petition for reconsideration "for the reason that the findings of division 1 are in accordance with the evidence and the applicable law." The complaint in this court resulted.

The Interstate Commerce Commission, United States of America, and the intervening defendants who had been granted permission to intervene by this court answered. It is to be noted that all answers were in defense of the decision of the Commission except the answer of the United States of America which "admits only that the Interstate Commerce Commission * * * has failed to make proper findings as to the inherent advantages of plaintiff's proposed mode of transportation," and " * * * prays that the orders of the Commission * * be annulled and set aside and that the matter be remanded to the Commission to make proper findings in accordance with the National Transportation Policy."

Plaintiff contends:

1. The order complained of is the result of arbitrary and capricious action, and the findings upon which it is based are unsupported by substantial evidence, and

2. In denying plaintiff's application the Interstate Commerce Commission has not correctly applied the standards of the National Transportation Policy, and failed to make adequate findings in terms of that policy.

The transcript of evidence discloses the following facts:

A large highway building program was scheduled by the State of Illinois for 1957 and future years. Large quantities of bulk cement are necessary for such construction. At present railroad service is used to carry bulk cement in the area involved.

Plaintiff is engaged as a common carrier in the business of transporting bulk liquid, principally petroleum products, by motor vehicle in interstate commerce over irregular routes between points in Illinois and Missouri and other states pursuant to authority granted by the Interstate Commerce Commission. Plaintiff is now operating 51 tractors and 36 tank trailers, and maintains terminals at various points in Illinois and Missouri. Because it has extra tractors available during the spring, summer and early autumn seasons when demand for bulk cement is heaviest, plaintiff filed this application. The special hoppers necessary to carry bulk cement, and existing terminals in Illinois and Missouri will be available, and service will be on call but not on schedule. Motor carrier service is mechanically feasible and economically practical. Plaintiff is financially responsible and would be a fit carrier to conduct the business. Hefkin Company and the Association of General Contractors of Illinois supported the application.

Hefkin Company is engaged in building highways in Missouri and Illinois, and maintains a ready-mix plant at Belleville, Illinois, which is supplied with cement from Alpha Portland Cement Company and Missouri Portland Cement Company from their St. Louis plants, the Universal Atlas Company of Hannibal, Missouri, and the Marquette Cement Company of Cape Girardeau, Missouri. Hefkin Company had purchased cement on one job from Lehigh Portland Cement Company at Mitchell, Indiana, which also has a plant at Oglesby, Illinois.

Motor transportation of bulk cement has many advantages over transportation by rail. When shipments are made by rail, cement must be ordered prior to the day on which it is scheduled to be used. In the event of rain the number of carloads arriving at the point of destination accumulates. The result is that quantities of cement on hand exceed the space available for storage, thereby necessitat-

ing the payment of demurrage. If truck service were available, cement would be ordered when needed and the order cancelled in the event of rain. To utilize rail service a special switch or spur line costing the consignee from $1,500. to $4,000. must be built at every job site. Except in instances where sand and gravel are shipped by rail instead of by truck this expense would be eliminated by motor service which is "door-to-door." In every instance, the additional truck service from railhead to job site presently needed would be eliminated. On one job Hefkin Company was compelled to truck bulk cement 4½ miles. Due to the volume of cement transported by rail and the sudden advent of winter weather large quantities of cement are usually left over at the completion of a job. Motor carriage permits small amounts of cement to be carried with greater flexibility and would eliminate the loss presently incurred when it is necessary to dispose of this surplus cement locally, since it would become economically feasible to move this surplus to new locations. Hefkin Company would utilize the truck service to supplement rail service.

The railroads at the present time have a sufficient number of hopper cars to transport bulk cement and anticipate loss of business if the certificate for motor truck service were to issue. No investigation was made as to whether Universal Atlas Company or Marquette Cement Company have present facilities for loading trucks, or if not, whether they intend to provide such equipment; the remaining three cement companies who now control the traffic for their bulk cement are not presently equipped for loading trucks, and because of the expense in establishing such facilities, have no immediate intention to build truck loading docks. If this application were granted and cement was trucked by or from a cement company these three cement companies would be forced by competition to make preparation for and use truck service.

Division 1 made the following conclusion which was adopted by the Commission:

"The paramount issue to be determined in this proceeding is whether public convenience and necessity require the operation proposed by applicant. It is incumbent on the latter to show, among other things, that the proposed service would serve a useful purpose responsive to a public demand or need. The record indicates that applicant has made no effort to determine whether any manufacturer of cement would use its service. Likewise, it appears that the supporting consignee has made no investigation of existing motor carrier service. Applicant does not have the support of a single cement manufacturer who would use its service. In fact, the evidence conclusively shows that the cement producers, who control the routing of the traffic, would not utilize its service. In the circumstances, we conclude that applicant has failed to sustain its burden of proof, and that the application should be denied. In view of this conclusion, there is no necessity to determine applicant's fitness and ability properly to conduct the proposed operation.

"We find that applicant has failed to establish that the present or future public convenience and necessity require the proposed operation; and that the application should be denied."

The oral argument and large portions of the briefs indicate that the decision of this court turns upon the proposition as to whether or not the denial of the application by the Commission was made in the light of the National Transportation Policy.[1] In Schaffer Transportation Co. v. United States, 355 U.S. 83, 87, 78 S.Ct. 173, 176, 2 L.Ed.2d 117, the court said:

"The National Transportation Policy, formulated by Congress,

1. National Transportation Policy, Accumulative Pocket Part preceding 49 U.S.C.A. § 1.

specifies in its terms that it is to govern the Commission in the administration and enforcement of all provisions of the Act, and this Court has made it clear that this policy is the yardstick by which the correctness of the Commission's actions will be measured."

As set forth in the Schaffer case at the foot of page 89 of 355 U.S., at page 177 of 78 S.Ct. this policy requires that

"When a motor carrier seeks to offer service where only rail transportation is presently authorized, the inherent advantages of the proposed service are a critical factor which the Commission must assess. How significant these advantages are in a given factual context and what need exists for a service that can supply these advantages are considerations for the Commission."

While it is for the Commission and not this court to determine the weight of the "inherent advantages of the proposed service" it is clearly inconsistent with the announced directives of the National Transportation Policy, for the Commission to conclude that the present or future public need does not require the service without assessing these "inherent advantages." The inquiry of the Commission must be directed not merely to the question, what public need exists for the proposed service, but "what [public] need exists for a service that can supply these advantages. * * *" The Commission here as in the Schaffer case in arriving at its conclusion as to whether public convenience and necessity required the proposed operation evidently ignored the critical factor, i. e., the advantages of motor carrier service to the public.

The defendants, except the United States of America, contend that the rationale of the Schaffer case is not applicable here for the reason that in the Schaffer case the shippers and consignees both requested the motor carrier service, whereas in the instant case the shippers opposed the truck carrier's application. It is further contended the finding in the instant case was not "that existing rail service is adequate" but rather "that applicant has failed to establish that the present or future public convenience and necessity require the proposed operation. * * *"

■■ While we should not substitute our judgment for that of the Commission, and though the Commission is not required to state a detailed explanation of its decision, nevertheless it is required that a sufficient reason be given by the Commission for the denial of the certificate to permit this court to determine the basis for its action. Chesapeake Motor Lines, Inc. v. United States, D.C.1957, 153 F.Supp. 812. When the conclusion of the Commission that the applicant did not sustain its burden of proof and the reasons stated for that conclusion are analyzed in view of the National Transportation Policy, it is clear the Commission failed to consider the advantages of the motor carrier service to the public. The fact that the supporting consignee may have failed to investigate existing motor carrier service is of no significance in the face of the evidence that applicant did inquire and no motor carrier appeared in opposition to the hearing. If there had been a prior certificate for the service in the area the Commission would have taken official notice of it. Riss & Co. v. United States, D.C.W.D.Mo.W.D. 1952, 117 F.Supp. 296. The Commission did not find that it would be useless to issue the certificate for truck service because it would never be used but merely that the cement producers would not presently utilize its service. The service could not and would not be used until it was available. The evidence disclosed that truck service for bulk cement would be practical. Future as well as immediate need of service is an essential element to be considered by the Commission as provided by the Act. United States v. Detroit & Cleveland Navigation Co., 1945, 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38. One cement producer opposed the application and agents of two cement producers testified on behalf of the railroads. These three producers had no immediate plan to convert to truck loading on ac-

count of the expense involved. The traffic manager of one cement company admitted that his company would install loading facilities for trucks if cement was trucked in the area by any of its competitors, and another stated he opposed the truck service "right now." There were at least five cement producers in the area supplying the consignee and two of these did not appear nor did any of their agents testify at the hearing. The consignees made it clear that it would use the motor service. The railroads anticipated a loss of traffic if the certificate for truck service issued. The State of Illinois was engaged in a large highway building program which was to continue in 1957 and future years that required large quantities of cement. Yet, insofar as it was explained, the Commission based its conclusion that the applicant did not sustain its burden of proving that the proposed service was responsive to public need, on the basis that the cement producers who controlled the routing of the traffic would not utilize its service. The fact that the shippers opposed the application and would not use the service, in itself, does not nullify or detract from the effect of the directive in the Schaffer case that the Commission must assess the advantages of the proposed service in relation to public need.

In the Schaffer case the Commission relied upon the fact that rail service was adequate omitting to disclose "whether on balance the public interest would be better served by additional competitive service." Schaffer Transportation Co. v. United States, supra, 355 U.S. at page 90, 78 S.Ct. at page 178. Here the Commission relied upon the shippers' interest without disclosing any reference to the interest of the receivers or consignees, nor to the inherent advantages of the truck service to the public need.

For the foregoing reasons the orders of the Interstate Commerce Commission herein are set aside and remanded to the Commission for further proceedings in accordance with this opinion.