**ARTUS TRUCKING COMPANY, INC.,**
**Plaintiff,**

v.

**INTERSTATE COMMERCE COMMIS-SION, and United States of America,**
**Defendants.**

**Civ. A. No. 73–C–1541.**

United States District Court,
E. D. New York.

June 27, 1974.

Arthur J. Piken, and Bruce J. Robbins, Flushing, N.Y., for plaintiff by

Bruce J. Robbins, Flushing, N.Y., of counsel.

Fritz R. Kahn, Gen. Counsel, and Peter A. Fitzpatrick, I.C.C., Washington, D.C., for defendant, I.C.C. by James K. Kurth, Washington, D.C., of counsel.

Thomas E. Kauper, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., David G. Trager, U. S. Atty., E.D.N.Y., Henry Brachtl, Asst. U. S. Atty., E.D. N.Y., Brooklyn, N.Y., John H. D. Wigger, Atty., Dept. of Justice, Anti-Trust Div., Washington, D.C., for defendant, United States.

Before MOORE, Circuit Judge, and BARTELS and TRAVIA, District Judges.

PER CURIAM.

Plaintiff seeks an order vacating and setting aside certain orders of the Interstate Commerce Commission ("ICC") which denied plaintiff's application for motor common carrier operating authority between New York, N.Y. and points within eight states and the District of Columbia, within a two hundred and fifty mile radius of New York, N.Y. The jurisdiction of this three judge court is invoked pursuant to Title 5 U.S.C. § 702 and Title 28 U.S.C. §§ 1336, 2325 and 2284.

The salient facts are as follows. Plaintiff is a motor contract carrier holding a permit issued in April 1962 to engage in the transportation of paper and paper bags between New York, N.Y. and points in eight states and the District of Columbia, within a two hundred and fifty mile radius of New York, N.Y. Pursuant to that authority, the plaintiff, up until two years ago, used its storage facilities located at Bush Terminal, Brooklyn, N.Y. to service its contracting shippers. Two years ago, by reason of a condemnation proceeding instituted by the City of New York, the plaintiff had to abandon its storage and terminal facilities at Bush Terminal. Appropriate space was acquired in Kearny, N.J. However, Kearny, N.J. is beyond the radial base point contained in the plaintiff's contract carrier permit. As a result, it became necessary for the plaintiff to obtain appropriate operating authority from the ICC in order to continue receiving and distributing its shippers' merchandise at Kearny, N.J.

Plaintiff made application to the ICC for both the permanent and temporary contract carriage authorization it required. The application for temporary contract carrier authority was granted and permitted the plaintiff to provide substantially the identical service authorized in its existing contract carrier permit but from the radial base point of Kearny, N.J. The plaintiff's application for permanent contract carrier authority was denied by the ICC on the grounds that the plaintiff's service to eleven shippers was not consistent with contract carrier status. *See* Unthum Trucking Co. Ext.—Phosphatic Feed Supplements, 91 M.C.C. 691 (1962). Instead, the ICC reasoned that the plaintiff's operation at Kearny, N.J. conformed to that of a motor common carrier. Accordingly, the ICC issued to the plaintiff a certificate of public convenience and necessity conditioned upon the fact that the plaintiff either request cancellation of its contract carrier permit originally issued in 1962 and having New York, N.Y. as its radial base point or request conversion of said permit to a certificate of public convenience and necessity.[1] Significantly, the plaintiff

---

1. The basis for the ICC's conditional issuance of the certificate is Title 49 U.S.C. § 310 which provides in pertinent part:
   "Unless, for good cause shown, the Commission shall find, or shall have found, that both a certificate and a permit may be so held consistently with the public interest and with the national transportation policy declared in this Act—
   * * * * *

(2) no person . . . shall hold a permit as a contract carrier authorizing operation for the transportation of property by motor vehicle over a route or within a territory, if such person . . . holds a certificate as a common carrier authorizing operation for the transportation of property by motor vehicle over the same route or within the same territory."

did not appeal or seek review of this order. Therefore, the validity of the ICC's decision to grant the plaintiff a certificate upon the cancellation or conversion of its existing contract carrier permit is not before the court. Rather, since the plaintiff sought conversion of its existing permit, the only issue before the court is the validity of the ICC's decision denying the plaintiff's conversion application.

The conversion application was processed under the ICC's modified procedure. Pursuant to this procedure, evidence is not taken at a hearing but rather through the submission of verified statements. Here, verified statements were filed in support of the application by the plaintiff and six of its contracting shippers. Verified statements in opposition to the application were filed by five existing common carriers servicing the New York metropolitan area and plaintiff submitted a rebuttal. On April 25, 1973, the ICC Review Board No. 1 denied the plaintiff's conversion application in its entirety. Subsequent thereto, plaintiff filed a Petition for Reconsideration which was similarly denied by the ICC's Division 1, acting as an appellate division, on August 29, 1973. Finally, plaintiff filed a petition with the ICC seeking further consideration of its application on the ground that an issue of general transportation importance was involved. This petition was denied by the ICC in General Session on October 11, 1973.

The fifth "appearing" paragraph of the ICC's order states:

"That in proceedings of this nature evidence of past operations alone is not sufficient, but in addition, shipper testimony which will demonstrate a need for applicant's service as a common carrier is likewise required, Connell Transport Co., Inc., Conversion Application, 95 M.C.C. 312, 319; that the evidence submitted by the supporting shippers herein (1) deals principally with shipments only from Kearny, which traffic applicant is already conditionally authorized to provide, (2) only indicates an occasional and undeterminable need for the transportation of an unspecified volume of the involved commodities on inbound shipments to the New York City area, (3) fails to identify representative points in the destination territory, (4) fails to indicate specific volumes moving to respective destination States or points therein, and (5) fails to indicate any deficiencies in existing services; that on the present record, we are not persuaded that a public need exists for the proposed common carrier service; and that the application, accordingly, should be denied."

In an attempt to show that the above set forth decision was rendered in an arbitrary and capricious manner and therefore constitutes an abuse of the ICC's discretion, the plaintiff argues that (1) the ICC improperly applied the relevant legal standards, (2) the ICC considered certain inapplicable and unnecessary criteria and (3) the ICC considered only portions of the entire record.

Much has been written concerning the district court's scope of review in analyzing the decision of an administrative agency. Suffice it to say that the district court has performed its function upon finding that the agency's conclusions have a rational basis. See Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Short Line, Inc. v. United States, 290 F.Supp. 939, 941 (D.R.I.1968); Consolidated Carriers Corp. v. United States, 321 F. Supp. 1098, 1100 (S.D.N.Y.1970), aff'd, 402 U.S. 901, 91 S.Ct. 1375, 28 L.Ed.2d 642 (1971). In reaching this determination the district court cannot substitute its judgment for that of the administrative body, United States v. Pierce Auto Freight Lines, 327 U.S. 515, 536, 66 S. Ct. 687, 90 L.Ed. 821 (1946); Raye and Company Transports, Inc. v. United States, 314 F.Supp. 1036, 1044 (W.D. Mo.1970), but rather the court must accept the agency's findings so long as

they are supported by substantial evidence on the record as a whole. Consolo v. Federal Maritime Commission, 383 U.S. 607, 619–621, 86 S.Ct. 1018, 16 L. Ed.2d 131 (1966); Kent Freight Lines, Inc. v. United States, 341 F.Supp. 787, 789 (D.Md.1972).

Utilizing this standard of review, the plaintiff's three arguments will be dealt with seriatim.

Firstly, plaintiff contends that the ICC erred in applying the standards for conversion applications enunciated in Connell Transport Co., Inc., Conversion Application, 95 M.C.C. 312 (1964), to the instant case. More specifically, the plaintiff points to the fact that in the case at bar the ICC cites *Connell* for the principle that, "shipper testimony which will demonstrate a need for applicant's service as a common carrier is likewise required" rather than for the correct principle that, "[s]hipper testimony which will demonstrate a need for applicant's services as a common carrier rather than as a contract carrier should, therefore, be produced." Plaintiff's argument continues that had the ICC properly applied the *Connell* standards, upon which it purportedly relied in denying the plaintiff's application, the ICC would have granted the application on the basis of the plaintiff's demonstration of past lawful operations performed under the operating authority sought to be converted and the shipper testimony demonstrating a need for a continuance of its service as a common carrier rather than as a contract carrier.

Under the particular facts of this case, it is arguable, in a literal sense, that the plaintiff's supporting shippers have demonstrated a need for the plaintiff's service as a common carrier rather than as a contract carrier. However, this demonstration of need is not predicated upon the public convenience and necessity but rather is predicated upon the fact that unless the plaintiff's contract carrier permit is converted to a certificate of public convenience and necessity, the plaintiff will not be able to provide contract or common carrier service from New York, N.Y., due to the restrictive provisions of Title 49 U.S.C. § 310. In essence, it is the plaintiff's position that while its supporting shippers do not care whether the plaintiff services them as a contract or common carrier, they do desire the continuation of the plaintiff's service. Since this service can only be provided as a common carrier pursuant to § 310, the plaintiff reasons that the requisite demonstration of need for its service as a common carrier has been made.

An historical analysis of the origin of common carrier operating authority and its application to conversion proceedings will show that evidence of past lawful operations and a demonstration of need by supporting shippers for a continuation of the applicant's service as a common carrier rather than as a contract carrier is not sufficient to warrant the granting of a certificate. What is needed is that the applicant submit evidence of past lawful operations and show that the public convenience and necessity require its service as a common carrier.

Title 49 U.S.C. § 307 states in relevant part:

"(a) . . . and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. . . ."[2]

This statute has been interpreted to mean that an applicant for a certificate

---

2. The Motor Carrier Act does not define the public convenience and necessity but rather Congress has left it up to the ICC to determine, in its expertise, what constitutes the public convenience and necessity from the particular facts presented in each case. *See, e. g.,* United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1951).

of public convenience and necessity must show [3] that:

"  .  .  .  the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest." *See* Pan American Bus Lines Operation, 1 M.C.C. 190, 203 (1936).

In *Connell, supra,* the ICC examined the history of conversion applications and delineated the prerequisites needed to convert a permit to a certificate pursuant to § 307. In holding that the applicant, a transporter of a variety of foodstuffs, had failed to sustain its burden of proof that there was a public need for its service as a common carrier, the ICC reasoned that conversion applications filed under § 307 cannot be treated the same as those filed under Title 49 U.S.C. § 312(c).[4] *Connell, supra* at 317. In 1957, Congress amended Title 49 U.S.C. § 309(b) [5] to permit contract carrier service only to named shippers. Concomitantly, Congress also provided a mechanism pursuant to § 312(c) by which existing contract carriers, whose "unlimited" permits did not meet the requirements of the new § 309(b) "limited" permits, might convert their "unlimited" permits to certificates. In such a conversion proceeding, all that had to be shown was that the applicant's operations did not conform with the definition of a contract carrier in Title 49 U.S.C. § 303(a)(15) [6] and that based upon the applicant's past lawful operations its service was that of a common carrier.[7] Thus, it is apparent that those applicants seeking conversion under § 312(c) were only attempting to change their classification from contract carrier to common carrier so as to comply with the 1957 amendments. They were not seeking conversion so as to enable them

3. The applicant has the burden of proving that the public convenience and necessity require its service as a common carrier. Lester C. Newton Trucking Co. v. United States, 264 F.Supp. 869 (D.Del.), aff'd, 389 U.S. 30, 88 S.Ct. 108, 19 L.Ed.2d 29 (1967).

4. Title 49 U.S.C. § 312(c) reads:
"The Commission shall examine each outstanding permit and may within one hundred and eighty days after August 22, 1957, institute a proceeding either upon its own initiative, or upon application of a permit holder actually in operation or upon complaint of an interested party, and after notice and hearing revoke a permit and issue in lieu thereof a certificate of public convenience and necessity, if it finds, first, that any person holding a permit whose operations on August 22, 1957, do not conform with the definition of a contract carrier in section 303(a)(15) of this title as in force on and after August 22, 1957; second, are those of a common carrier; and, third, are otherwise lawful. Such certificate so issued shall authorize the transportation, as a common carrier, of the same commodities between the same points or within the same territory as authorized in the permit."

5. Title 49 U.S.C. § 309(b) states in part: "In determining whether issuance of a permit will be consistent with the public interest and the national transportation policy declared in this Act, the Commission shall consider the number of shippers to be served by the applicant . . . . ."

6. As amended in 1957, Title 49 U.S.C. § 303(a)(15) provides: "The term 'contract carrier by motor vehicle' means any person which engages in transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation (other than transportation referred to in paragraph (14) of this subsection and the exception therein), under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer."

7. A common carrier is defined in Title 49 U.S.C. § 303(a)(14) as:
"  .  .  .  any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property or any class or classes thereof for compensation. . . . ."

to service the general public as opposed to a limited number of contracting shippers. Indeed, a § 312(c) certificate authorized only those operations that had been performed in the past. As a result, evidence of past lawful operations was sufficient to sustain an applicant's burden of proof pursuant to § 312(c). In contrast, an applicant who seeks to convert its contract carrier permit to a certificate under § 307, after the passage of the 1957 amendments, does so in an attempt to gain authority for a qualitatively different operation. A contract carrier who seeks conversion under § 307 *is* doing so to enable it to service the general public rather than a limited number of contracting shippers. Accordingly, such an applicant must come forward with not only evidence of past lawful operations but also evidence that the present or future public convenience and necessity require its service as a common carrier. It was with this qualitative difference in mind that the ICC stated in *Connell, supra* at 319 that "[s]hipper testimony which will demonstrate a need for applicant's services as a common carrier rather than as a contract carrier should, therefore, be produced." Similarly, it was with the aforementioned qualitative difference, between conversion applications instituted under § 312(c) and those instituted pursuant to § 307, in mind that the ICC remarked in the fifth "appearing" paragraph of its order that, "shipper testimony which will demonstrate a need for applicant's service as a common carrier is likewise required." In sum, it makes absolutely no difference that in the conversion application at bar the ICC left out the words "rather than as a contract carrier," which it included in *Connell, supra*. In both proceedings, the ICC's standards were the same. Namely, under § 307 a showing of past lawful operations alone is not sufficient to warrant the conversion of a permit to a certificate. In addition, it must be shown that the present or future public convenience and necessity require the applicant's service as a common carrier.

It is therefore apparent that the plaintiff's assertion that had the ICC correctly applied the *Connell* standards it would have granted the plaintiff's conversion application is erroneous. Pursuant to the standards set forth in *Connell, supra* and again in this case, evidence proffered by the plaintiff's supporting shippers that they need a continuation of the plaintiff's service as a common carrier rather than as a contract carrier is clearly insufficient to establish a public need for the plaintiff's service as a common carrier. Perhaps such a showing would have been adequate under § 312(c) since the plaintiff is actually seeking conversion of its permit to a certificate so that it may continue to service its contracting shippers in the New York metropolitan area. However, such a showing is inadequate under the more stringent requirements of § 307.

■ Secondly, plaintiff asserts that the criteria delineated in John Novak Contract Carrier Application, 103 M.C.C. 555 (1967), are unnecessary and inapplicable to a determination of a conversion application. In *Novak*, the ICC set forth the criteria [8] utilized in determining whether a public need exists for any grant of motor carrier operating authority. In substance, these criteria were established so that the ICC might have before it sufficient facts to support a well informed decision. *Id.* at 557. Consequently, if an applicant is to prove a prima facie case, it must make the

---

8. In John Novak Contract Carrier Application, 103 M.C.C. 555, 557 (1967), the ICC stated:

"It will be seen that the shippers and consignees supporting an application for the transportation of property are asked to 'identify clearly the commodities they ship or receive, the points to or from which their traffic moves, the volume of freight they would tender to applicant, the transportation services now used for moving their traffic, and any deficiencies in existing services.' This is the minimum showing expected of any applicant seeking a grant of motor carrier authority."

minimum showing required by the *Novak* criteria. *Id.*; *see also* Richard Dahn, Inc. v. I.C.C., 335 F.Supp. 337 (D.N.J.1971). Since the plaintiff has not cited any precedent as to why the ICC should have departed from its established procedure in this case, it appears that the ICC was perfectly correct in using the *Novak* criteria as a framework to determine whether there was a public need for the plaintiff's service as a common carrier.

■ The plaintiff raises one other point with respect to its position that the *Novak* criteria are inapplicable to conversion proceedings which should be discussed. The plaintiff maintains that the ICC cannot square the *Novak* requirement that an applicant demonstrate through its supporting shippers deficiencies in existing service with the *Connell* requirement that the applicant submit through its supporting shippers a detailed statement of its past lawful operations. Stated differently, how can the supporting shippers indicate deficiencies in the plaintiff's service and also submit evidence that the plaintiff has consistently serviced them as a contract carrier over the years? The weakness in this argument lies in the fact that the ICC was not referring to deficiencies in service provided by the plaintiff to its contracting shippers. Rather, the ICC was referring to deficiencies in present service which would establish a public need for the applicant's service as a common carrier. If, for example, the existing common carriers within a certain area are capable of servicing the general public, there would be no reason for the ICC to grant a certificate to an applicant seeking to gain common carrier operating authority for that area. Therefore, the requirement in *Novak, supra,* that the applicant submit evidence of deficiencies in existing service and the requirement in *Connell, supra,* that the applicant supply the ICC with evidence of its past lawful operations are not inconsistent. On the one hand, the ICC is concerned with whether existing deficiencies in service warrant the granting of a certificate. On the other hand, the ICC is concerned with whether the applicant's use of authority which it seeks to convert can be verified.

■ The plaintiff also avers that by requiring the plaintiff to satisfy both the *Connell* standards and the *Novak* criteria, the ICC is holding the plaintiff to a greater standard of proof than that required of an applicant seeking a certificate in the first instance. This is simply not true. In both an original and a conversion application, the applicant must show that a public need exists for its service as a common carrier. The *Novak* criteria merely provide the ICC with guidelines in reaching a determination of this issue.

■ Thirdly, the plaintiff contends that the ICC based its order on only a portion of the record, rather than the entire record, and that such action was arbitrary and capricious. Whether or not the public convenience and necessity require an applicant's service as a common carrier is particularly within the expertise of the ICC. Interstate Commerce Commission v. Parker, 326 U.S. 60, 65, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945); Perkins Furniture Transport, Inc. v. United States, 333 F.Supp. 879, 883 (S.D.Ind.1971); Quality Carriers, Inc. v. United States, 289 F.Supp. 809, 811–812 (E.D.Wis.1968). Consequently, an order of the ICC, involving its expertise, is clothed with a presumption of validity. Allegheny Ludlum Steel Corporation v. United States, 325 F.Supp. 352, 354 (W.D.Pa.1971) rev'd on other grounds, 406 U.S. 742, 92 S.Ct. 1914, 32 L.Ed.2d 453 (1972). Furthermore, it should be mentioned that the ICC is not required to make detailed findings of fact and to point to each bit of evidence which supports its order. *Kent Freight Lines, Inc., supra;* Armored Carrier Corporation v. United States, 260 F. Supp. 612, 615 (E.D.N.Y.1966), aff'd, 386 U.S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967).

■ The ICC grouped its conclusions around the *Novak* criteria in de-

termining that a public need did not exist for the plaintiff's service as a common carrier. *See* fifth "appearing" paragraph of ICC order, *supra*. With respect to the evidence submitted by the supporting shippers, Northwest Paper Company and Westvaco Corporation, the ICC found that Northwest and Westvaco indicate "a need for service from applicant's storage facilities at Kearny, to points in the destination States, and occasionally on return shipments of surplus merchandise to customers in the New York City area." Northwest in its verified statement, asserted that between one and three per cent of the company's tonnage shipped to customers within the area herein involved falls within the category of return shipments of surplus merchandise within the New York City area. Similarly, Westvaco's representative stated that reshipment of surplus merchandise constitutes only three per cent of the total volume of shipments handled by the plaintiff. Plaintiff agrees that both these two shippers are primarily concerned with the movement of their traffic from the plaintiff's facility in Kearny, N. J. However, the plaintiff does take issue with the ICC's characterization that Northwest and Westvaco have only an occasional need for return service to the New York City area. Plaintiff urges that while it is true that this service amounts to only one to three per cent of Northwest and Westvaco's transportation requirements, the ICC erred in not considering this to be substantial traffic for the above percentages convert to hundreds of thousands of pounds of the involved commodities which move in small, less than truckload, quantities. Plaintiff cites no authority in support of this position and as a result this court will defer to the ICC's expertise and accept its finding that the traffic is not substantial. The ICC also determined from the verified statement submitted by the Harbor Paper Co. that this company has an "occasional need for the transportation of reconsigned shipments from its customers in Pennsylvania and New York, N.Y., but fails to indicate the volume of traffic that has moved in this regard in the past, or the volume it expects to tender to applicant in the future." A perusal of the verified statement of the Harbor Paper Co.'s representative supports the ICC's position and further indicates that this shipper supported the plaintiff's application mainly so that the plaintiff could continue to service the shipper's occasional reconsignment of merchandise to New York City. The plaintiff has not seen fit to directly attack the ICC's findings as they relate to the Harbor Paper Co. Indeed, the plaintiff does not directly attack any of the ICC's findings concerning the remaining shippers. The findings of the ICC as they relate to the evidence submitted by the Olympia Paper Co., the Emblum Paper Corporation and the Canfield Paper Co. are also corroborated by the verified statements of these shippers. Consequently, it seems that the ICC considered all of the evidence and not just selected portions, as the plaintiff would lead the court to believe, in rendering its decision. Moreover, an analysis of the entire record clearly shows that the ICC's findings and order are supported by substantial evidence.

█ Lastly, the plaintiff makes reference to the fact that the protestants herein have not participated in the involved traffic and that by and large the protestants only have limited authority to provide the service being provided by the plaintiff to its contracting shippers. Thus, the plaintiff suggests that the granting of its application would not have a deleterious effect on the protestants' operations. Be this as it may, the effect of granting an application on the other carriers in an area is only one of the factors to be taken into account by the ICC. As such, a finding of no harm to the other carriers is not dispositive of the question whether to grant a certificate, it is merely one of the inputs to be

considered. *See Pan American Bus Lines Operation, supra.*

Accordingly, it is

Ordered that the plaintiff's motion for an order vacating and setting aside the Interstate Commerce Commission's orders of April 25, 1973, August 29, 1973, and October 11, 1973 is denied; and it is further

Ordered that the Interstate Commerce Commission's findings and orders of April 25, 1973, August 29, 1973, and October 11, 1973 are affirmed; and it is further

Ordered that the complaint is dismissed.